```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    UNITED STATES OF AMERICA,      )   Docket No. 15 CR 315
                                     )
 4                    Plaintiff,     )   Chicago, Illinois
                                     )   April 27, 2016
 5              v.                   )   10:01 a.m.
                                     )
 6    JOHN DENNIS HASTERT,           )
                                     )
 7                    Defendant.     )

 8                 TRANSCRIPT OF PROCEEDINGS - Sentencing
                   BEFORE THE HONORABLE THOMAS M. DURKIN
 9
      APPEARANCES:
10

11    For the Government:    HONORABLE ZACHARY T. FARDON
                             United States Attorney by
12                           MR. STEVEN A. BLOCK
                             MS. DIANE MacARTHUR
13                           Assistant United States Attorneys
                             219 S. Dearborn Street, 5th Floor
14                           Chicago, IL 60604

15
      For the Defendant:     SIDLEY AUSTIN LLP by
16                           MR. THOMAS C. GREEN
                             1501 K Street NW, Suite 600
17                           Washington, D.C. 20005

18                           SIDLEY AUSTIN LLP by
                             MR. JOHN N. GALLO
19                           MS. GEETANJLI MALHOTRA
                             One S. Dearborn Street
20                           Chicago, IL 60603

21
      Also Present:          MS. SARAH KIECKHAFER, U.S. Probation
22

23    Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Room 1432
                             Chicago, IL 60604
25                           312.435.6053
                             laura_renke@ilnd.uscourts.gov
```

1          (In open court; defendant present.)

2               THE CLERK:  All rise.

3               Be seated, please, and come to order.

4               15 CR 315, United States of America v. John Dennis

5     Hastert.

6               MR. BLOCK:  Good morning, your Honor.  Steven Block

7     and Diane MacArthur on behalf of the United States.

8               THE COURT:  Good morning.

9               MR. GREEN:  Good morning, your Honor.  Tom Green and

10    John Gallo and Geeta Malhotra on behalf of Mr. Hastert.

11              MR. GALLO:  Good morning.

12              THE COURT:  All right.  Good morning.

13              MS. KIECKHAFER:  Good morning, your Honor.  Sarah

14    Kieckhafer from probation.

15              THE COURT:  Okay.  Good morning all.

16              We're here for sentencing.  Is everyone ready to

17    proceed?

18              MR. GREEN:  Yes, sir.

19              MR. BLOCK:  Yes, your Honor.

20              THE COURT:  All right.  I have received the following

21    documents.  I want to make sure I have everything that I should

22    have.

23              I've received the presentence report and a supplement

24    to it and the recommendation of the probation officer.  These

25    are Documents 63, 64, and 90.

1          I have a defendant's sentencing memorandum, the

2     defendant's response to the presentence report and sentencing

3     recommendation.

4          The government's sentencing memorandum.

5          A large number of letters in mitigation for the

6     defendant and a large number of letters in aggravation against

7     the defendant, some of which I received as early as this

8     morning.  Every letter, e-mail, and voice mail I've received

9     I've made part of the public record.  The voice mails I've had

10    transcribed and put in the public record.  The e-mails and

11    letters have all been posted.

12         Earlier letters filed by the defense that were not

13    part of the public record I did not consider unless you later

14    filed them publicly.  And you filed a number of them publicly,

15    and I've considered all of them.

16         I have also received a letter from the defendant's

17    physician, Dr. Kevin Egly of Sandwich, Illinois, and a letter

18    from the court-appointed expert, Dr. Robert Golden of

19    Northwestern.

20         I've also received a letter from Dr. Paul Harvey, the

21    regional medical director of the Bureau of Prisons.

22         And in the last few days, I received a submission from

23    the defense relating to health issues of the defendant, which

24    attaches a letter from Mr. Phillip Wise, a consultant who

25    specializes in Bureau of Prisons health care issues.

1        The doctor letters and Mr. Wise's letter are not part

2    of the public record, but they address -- because they address

3    confidential medical information, but they have been carefully

4    reviewed by me.  They've been given to all the parties, and the

5    parties are free to discuss any parts of the letters they want

6    during these proceedings.

7        Are there any other documents the parties believe I

8    should have before continuing with the sentencing?  First the

9    government.

10            MR. BLOCK:  Not from the government, your Honor.

11            THE COURT:  Defense.

12            MR. GREEN:  None that we know of, your Honor.

13            THE COURT:  All right.  I will state for the record

14    the presentence report was well written, thorough, and

15    reflected the level of excellence I've observed from the

16    Chicago probation office in my three and a half years on the

17    bench.  So I compliment Ms. Kieckhafer on the report.

18        I'd also like to thank the attorneys for the

19    government, Mr. Block and Ms. MacArthur, and the attorneys for

20    the defendant, Mr. Green, Mr. Gallo, and Ms. Malhotra.  The

21    written submissions from both sides have been excellent and

22    provide me with the important information I need to render a

23    decision, along with anything I learn today.

24        So the United States through the Assistant

25    U.S. Attorneys and the defendant through his attorneys have

1      been well served by their conduct.

2              All right.  Has the -- have you received a copy of the

3      presentence report and discussed it with your client?

4              MR. GREEN:  We have, your Honor.

5              THE COURT:  I'd like an acknowledgment from the

6      defendant himself that he has read and reviewed the presentence

7      report.  He doesn't need to stand.  Just make sure the

8      microphone is in front of him.

9              But I would like the defendant to acknowledge he, in

10     fact, has read the presentence report and discussed it with his

11     attorneys.

12             THE DEFENDANT:  Yes, I have.

13             THE COURT:  All right.

14             The first question is, are there any objections to the

15     presentence report?  I'll get into guideline calculations in a

16     minute.  But are there any objections to the factual

17     recitations in the presentence report or the supplement to it?

18             MR. GREEN:  There are no objections other than what we

19     have noted in our submission, your Honor.

20             THE COURT:  All right.  There was one objection to

21     something that was contained in the recommendation relating to

22     the possibility of other victims.  I won't consider speculative

23     evidence.  But it is not a correction to the presentence report

24     itself.  So I will note for the record your objection to that,

25     but it's not part of the presentence report itself.

1      MR. GREEN:  Yes, sir.

2      THE COURT:  All right.  As to the guideline

3  calculations, the parties all agree, as do I, that the criteria

4  of Section 2S1.3(b)(3) have been met.  The proceeds were not

5  unlawfully obtained and were used for a lawful purpose, so the

6  so-called safe harbor provision of the advisory sentencing

7  guidelines applies to make the base offense level 6.

8      The probation officer recommended that two points be

9  added for obstruction under Section 3C1.1, something the

10  defense objects to because any obstructive conduct did not

11  relate to the count of actual conviction.

12      The case law supports the defense on this, and the

13  government agrees with the calculation through the plea

14  agreement.  Having looked at the case law, I believe the

15  defense is technically correct as far as guideline calculations

16  are concerned.

17      The probation officer makes a number of compelling

18  arguments why the defendant engaged in obstructive conduct, and

19  I'll consider those arguments and that conduct as part of the

20  factors under 18 U.S.C. 3553(a) that I must consider, but the

21  points won't be added to the base offense level for the

22  advisory guideline calculation.

23      The defendant has pled guilty to the crime of

24  structuring, so he receives acceptance of responsibility

25  points -- credit, two points -- for admitting to the crime of

1    conviction.

2            That leaves an adjusted offense level of 4, with a

3    criminal history category of I, and that leads to an advisory

4    guideline range of zero to six months' incarceration.

5            Do the parties have any objection to those findings?

6    First, the government.

7            MR. BLOCK:  Not from the government, your Honor.

8            THE COURT:  And the defense.

9            MR. GREEN:  No, sir.

10           THE COURT:  All right.  I'll note that even if I had

11   added the two points for obstruction that was recommended by

12   probation and did not give acceptance of responsibility points

13   to the defendant, it would lead to an adjusted offense level of

14   8 and still an advisory guideline range of zero to six months'

15   incarceration.

16           Now, I would like to ask first the government.  Are

17   you expecting any -- to call any witnesses or any type of

18   evidentiary hearing?

19           MR. BLOCK:  Yes, your Honor.  There are two witnesses

20   that we would ask to have address the Court.

21           THE COURT:  All right.  And who are they?

22           MR. BLOCK:  The first is Jolene Burdge, and the second

23   is Individual D.  And I'd like him to introduce himself to the

24   Court.

25           THE COURT:  All right.  But he will be testifying and

1   providing his full name when he testifies.

2          MR. BLOCK:  Yes, your Honor.

3          THE COURT:  All right.

4          And is the defense expecting to call any witnesses?

5          MR. GREEN:  No, sir.

6          THE COURT:  All right.

7          All right.  Well, I will make a finding then that the

8   advisory guideline range is, as I just stated, zero to six

9   months and that there be an adjusted offense level of 4.

10          Are there any formal motions for departures?  Not

11  variances, but departures.  First from the government.

12          MR. BLOCK:  Not from the government.

13          THE COURT:  And from the defense.

14          MR. GREEN:  No, sir.

15          THE COURT:  All right.  After calculating the

16  guidelines and finding no departures are appropriate, I must

17  now consider the relevant factors set out by Congress in

18  18 U.S.C. 3553(a) and ensure that I impose a sentence

19  sufficient, but not greater than necessary, to comply with the

20  purposes of sentencing.

21          These purposes include the need for the sentence to

22  reflect the seriousness of the crime, to promote respect for

23  the law, and to provide just punishment for the offense.  The

24  sentence should also deter criminal conduct, protect the public

25  from future crime by the defendant, and promote rehabilitation.

1    In addition to the guidelines and policy statements, I

2    must consider the nature and circumstances of the offense, the

3    history and characteristics of the defendant, the need to avoid

4    unwarranted sentence disparities among similarly situated

5    defendants, and, finally, the types of sentences available.

6    Before I ask the government to argue about the

7    application of such factors and request a variance or otherwise

8    make a sentencing recommendation, I think it's appropriate you

9    call your witnesses.

10   Attorneys can all be seated if they wish.

11   Please call your first witness.

12   MR. BLOCK:  Thank you, your Honor.

13   And we would -- the witnesses will be reading

14   statements, not providing testimony through the form of

15   questions, so I'd ask they be able to address the Court from

16   the podium.

17   THE COURT:  They may, but they're going to be sworn

18   in.

19   MR. BLOCK:  Yes, your Honor.

20   THE COURT:  All right.  Please call your first

21   witness.

22   MR. BLOCK:  Jolene Burdge, please step up.

23   THE COURT:  And if the defense decides they want to

24   ask questions of any of these witnesses, you're free to do so,

25   but the witness will take the stand rather than you asking

1  questions next to them.

2          MR. GREEN:  Understand, your Honor.

3          THE COURT:  All right.

4          THE CLERK:  Raise your right hand, please.

5      (Witness duly sworn.)

6          MS. BURDGE:  I do.

7          THE COURT:  You may proceed.

8          MS. BURDGE:  My name is Jolene Burdge, and I am the

9  sister of Stephen Reinboldt.

10          "Dear Mom:  It rained this morning, but now the sun is

11  out and the air is crisp and clean.  I've been on a shopping

12  spree these past couple of days, so now I have to kick back to

13  the first of the month.

14          "I got a new pair of sneakers and replaced my lawn

15  chair rocker, both on sale, and got the new Bruce Springsteen

16  and Annie Lennox albums, so I'm happy but broke.

17          "Usually I'm in the backyard trying to get some sun,

18  rocking in the rocking chair.  On Friday I go to the oncology

19  department so they can check out my KS sores, but I don't think

20  there is a lot they can do for me.

21          "The taxi comes to pick me up and takes me back home,

22  so I don't have to worry about driving.  Other than that, it's

23  steady as she goes."

24          Steve died five months after writing this letter.  He

25  was 42 years old.  His last years were spent alone in a

1  one-room apartment, barely able to support himself, waiting to

2  die.

3  The sight in his right eye was gone. Neuropathy made

4  it hard to walk, and the people shunned him when they saw his

5  KS lesions. He had long given up trusting people and found

6  solace in his music and movies.

7  He spent most of his life jumping from job to job or

8  having no job at all.

9  His letters were full of false hope that next week or

10  next month or next year would be better. If Mom could just

11  send him a little money to get him through the month, he knew

12  his break was coming.

13  He used to send me VHS tapes full of his favorite

14  movies, along with commentary notes explaining the special

15  effects, history of the director, new techniques in lighting

16  and sound, letters full of passion for the arts and film he

17  dearly loved, dreams and goals he would never fulfill.

18  I held Steve's hand the night he died. Fear of the

19  AIDS epidemic was at its height in 1995 Los Angeles. There was

20  only one funeral home that would pick up his body from the

21  hospice, and it was in the cover of night.

22  After six years of helping him bear yet another

23  secret, his burdens were finally lifted. Mine got heavier, and

24  that's when it all changed: No more secrets. No more guilt or

25  shame for the choices we had to make in order to survive.

1    If ever given the chance, I would confront you face to

2    face and make you accountable for sexually molesting my

3    brother.  20 years ago you treated me like an insignificant

4    annoyance, but I knew your secret and you couldn't bribe or

5    intimidate your way out.

6    Now I stand here 20 years later with the truth on my

7    side.  I hope I have been your worst nightmare.

8    Like many, Steve thought you were a wonderful teacher,

9    committed to upholding the educators' code of ethics to help

10   each student realize his or her potential as a worthy and

11   effective member of society, to protect the students from

12   conditions harmful to learning or to their health and safety, a

13   generous man who wanted to be a friend and mentor, helping kids

14   get through their teenage years.

15   And our family had very tough years.  Emotional and

16   physical abuse, neglect, alcoholism, and mental illness leave a

17   kid looking for refuge.  That's exactly what you gave him.  You

18   showed interest in his life and encouraged him to participate

19   in activities; someone really cared.  But your words and

20   actions were soon used as weapons to get what you wanted all

21   along.

22   You took Steve's right to discover and develop his

23   sexual identity in a normal, healthy way.  His diminishing

24   self-worth left him vulnerable to your ongoing manipulation.

25   His social worker once commented that you made it impossible

1    for Steve to see the situation clearly.

2          Telling Steve's story without the sexual abuse is like

3    telling the story of the Titanic without the ship.  You think

4    you can deny your abuse of Steve because he can no longer speak

5    for himself.  That's why I'm here.

6          You claim to be deeply sorry and remorseful for what

7    you did years ago.  You claim to understand the gravity of your

8    misconduct and are prepared to accept responsibility for your

9    actions.  How can that be when you refuse to acknowledge the

10   true reason behind the money structuring and lying to the FBI?

11         Don't be a coward, Mr. Hastert.  Tell the truth.  What

12   you did wasn't misconduct; it was sexual abuse of a minor.

13   Call it what it is.  Show us that honesty, integrity, and

14   decency that you and all your supporters claim you live by.

15         I don't remember the last Christmas or birthday I

16   spent with Steve.  While you were enjoying holidays and time

17   with your family, we were wondering where Steve was or if he

18   was even alive.  If he had died, how would we ever find him?

19         I miss him so much.  No one ever made me brag louder

20   or laugh harder no matter how awful things were at home.  After

21   he died, it was hard to breathe.

22         Your family members have expressed concern about how

23   much time they might have left with you based on your current

24   health conditions.

25         From Steve's high school graduation in 1971 until his

death 24 years later in 1995, I estimate I had one year with Steve. The rest of those years he spent running from the pain and turmoil of lifelong trauma and the knowledge that no one would believe you were his abuser. He felt betrayed, ashamed, and embarrassed.

When a man is sexually assaulted, it means they weren't strong enough to fight back: It must have been his fault. He wasn't strong enough. You were supposed to keep him safe, not violate him. Obviously, he couldn't trust his own judgment of a person's character.

You are pleading for people to remember all the wonderful things you have done for individuals and the Yorkville community. Family and supporters praise you as a father and friend. One even suggests we should minimize your slight flaw of being a child molester.

That is impossible and morally wrong, just as it was impossible for Steve to minimize the extent of your mental and emotional abuse. You took his life, Mr. Hastert, not because he died of AIDS, but because you took his innocence and turned it against him. He was too young and vulnerable to understand that. It led him down a path of high-risk, reckless behavior, which ultimately cost him his life.

I'm fairly certain your supporters would feel differently if this had been their brother, sister, son, or daughter.

1    I will always wonder if you are truly sorry for what

2  you did or just sorry you got caught.

3    "Dear Mrs. Reinboldt:  I don't think I have ever met

4  you, but I did have the pleasure of knowing Steve.  I worked

5  with Steve one summer at the Yorkville Tastee-Freez.  My

6  parents thought it would be great for me to work there and stay

7  with my grandma who lived close by.  It wasn't so easy for me,

8  though, because I was a nobody from another town, not popular

9  or a cheerleader like most of the other girls.

10    "Steve's friendliness, kindness, and sense of humor

11  kept me coming back to work each day and enjoying it.  He was

12  very special.  He probably has no idea what his kindness meant

13  to me.  I am truly sorry for your loss."

14    This was Steve's character.  His care and love for

15  people was real and unsolicited.

16    Today is a tribute to Steve for all he endured and all

17  he held inside his entire life.  I know he stands here with me

18  today, free and at peace.  I will accept and respect whatever

19  decision this Court makes today.  Our victory is knowing that

20  this man is finally being brought to justice and will live in

21  his own prison for the rest of his life.

22    Thank you.

23    THE COURT:  Thank you, Ms. Burdge.

24    Government may call its next witness.

25    MR. BLOCK:  Thank you, your Honor.

1          THE COURT:  Mr. Green, did you have questions, by the

2    way, of Ms. Burdge?

3          MR. GREEN:  No, sir.

4          THE COURT:  All right.  Thank you.

5          THE CLERK:  If you could raise your right hand,

6    please.

7       (Witness duly sworn.)

8          MR. CROSS:  I do.

9          Good morning.  Thank you very much, Judge Durkin, for

10   this opportunity to speak to you today and to discuss how

11   Mr. Hastert has affected my life.

12         My name is Scott Cross.  I'm 53 years old.  I live in

13   the Chicago area with my wife and my two children.  I've worked

14   in the financial services community for over 30 years, since

15   graduating from college in 1984.

16         In 1972, when I was ten years old, my family moved

17   from the south side of Chicago to Yorkville, Illinois.  My

18   father was a Methodist minister, and we moved often.  But we

19   spent the next nine years in Yorkville, and I consider

20   Yorkville to be my childhood home.

21         A few years after we moved to Yorkville, when I was

22   about 13 years old, Coach Hastert's high school wrestling team

23   won the Illinois state championship.  For a small town like

24   Yorkville, this was a very significant event.  Coach Hastert

25   was revered in Yorkville, and after the state championship,

1    there was even a parade throughout the town, celebrating him

2    and the team.

3            As a young boy, I wanted to be part of what Coach

4    Hastert had created.  I was a small guy with a lot of ambition,

5    and wrestling seemed to be the perfect sport for me.  I jumped

6    in with both feet, and wrestling became very important to me.

7    My perception of myself as a wrestler dominated my high school

8    experience.

9            I was selected by Coach Hastert to join him at

10   wrestling camps in Virginia and Colorado, including wrestling

11   camps that were held even before I entered high school.  As a

12   freshman, I was chosen to wrestle at the varsity level in one

13   match.  This was one of my proudest moments in high school.

14           As a senior, I was named captain of the wrestling

15   team.  I was good enough and lucky enough to wrestle in high

16   school state championship tournaments as a junior and a senior.

17           As a high school wrestler, I looked up to Coach

18   Hastert.  He was a key figure in my life as a coach and a

19   teacher.  In a small town where the high school and high school

20   athletics were extremely important, I respected and trusted

21   Coach Hastert.

22           Forgive me.

23           THE COURT:  Take your time.

24           MR. CROSS:  Coach Hastert sexually abused me my senior

25   year of high school.

1      In fall 1979, my senior year, I stayed late after

2   practice.  Our school had built a separate wrestling room with

3   a separate locker room for wrestlers.  I was alone with Coach

4   Hastert in that locker room.  I was concerned about making

5   weight for a match scheduled to occur the following day.

6      Coach Hastert told me he could help me lose weight by

7   giving me a massage.  Because I trusted him, I believed what he

8   was saying and took him at his word.  He told me to get down on

9   the training table in the wrestlers' locker room and lay

10  facedown with my shirt off.  He began giving me a massage.

11     After a few minutes, Coach Hastert told me to roll

12  over onto my back.  He pulled down my shorts, grasped my penis,

13  and began to rub me.  I was stunned by what he was doing.  I

14  jumped up, pulled up my shorts, and ran out of the locker room.

15     I did not say anything to anyone.  I did not talk

16  about it, what Coach Hastert had done to me, with my parents,

17  my brothers, other coaches, or school officials.  Coach Hastert

18  and I never spoke of it.

19     As a 17-year-old boy, I was devastated.  I tried to

20  figure out why Coach Hastert had singled me out.  I felt very

21  alone and tremendously embarrassed.  I felt intense pain,

22  shame, and guilt.  Today I understand that I did nothing to

23  bring this on, but at age 17, I could not understand what

24  happened or why.

25     As I reflected on this after leaving high school, I

1   realized there was other troubling behavior from Coach Hastert

2   that I did not appreciate at the time.  Coach Hastert kept a

3   recliner positioned in the wrestlers' locker room where he

4   would sit and watch the wrestlers in the shower.  I had

5   accepted this because I trusted him, and my teammates appeared

6   to as well.

7           I've always felt that what Coach Hastert had done to

8   me was my darkest secret, particularly as Coach Hastert became

9   more famous as a politician and Illinois state legislator and

10  then in Congress and finally as Speaker of the House.

11          After this prosecution became public, I told my older

12  brother and my wife for the first time what had happened.  I

13  shared this with my parents for the first time last year when I

14  realized that I needed their support as this prosecution

15  proceeded in the public spotlight.

16          I sought professional help to get me through the pain

17  and the trauma that has suffered -- surfaced since the

18  prosecution began.  I've had trouble sleeping and working.

19  This entire experience has been enormously painful for me and

20  my family.

21          Given these challenges, you might be asking me why I

22  came forward today.  This decision to appear before you in this

23  very public setting has been a huge personal struggle.  In

24  fact, until I actually got up to this podium, I was not even

25  sure I would be able to bring myself to speak to you in this

1    courtroom.

2          I'm only able to do this now because I wanted you to

3    know and understand how Mr. Hastert violated the trust I placed

4    in him as a high school student.  Judge Durkin, I wanted you to

5    know the pain and suffering he caused me then and still causes

6    me today.

7          As importantly, I want my children and anyone else who

8    was ever treated the way I was to know that there's an

9    alternative to staying silent.  As deeply painful as it has

10   been to discuss this with my family and with you, staying

11   silent for years was worse.  It is important to tell the truth

12   finally about what this -- what happened to me.  I could no

13   longer remain silent.

14         Thank you for listening to me.

15         THE COURT:  Thank you, Mr. Cross.

16         Are there any questions, Mr. Green?

17         MR. GREEN:  No, sir.

18         THE COURT:  All right.  Thank you, sir.

19         MR. CROSS:  Thank you.

20         THE COURT:  All right.  I'll ask the government now if

21   they wish to argue about the application of the factors set

22   forth in 3553(a), request a variance, or otherwise make a

23   sentencing recommendation.

24         MR. BLOCK:  We would, your Honor.

25         THE COURT:  All right.  You may proceed, Mr. Block.

1      MR. BLOCK:  Thank you, Judge.

2      Your Honor, the government began this investigation

3   with no preconceived notions of where the evidence would lead.

4   The investigation focused on what we thought was recent

5   conduct, defendant's financial transactions between 2010 and

6   2014.

7      We certainly did not know we would end up in a

8   courtroom like this, hearing from a former student who

9   defendant sexually abused and the sister of another one of

10  defendant's victims.  We didn't expect to be here hearing them

11  describe the anguish the defendant put them through.

12     The investigation instead focused almost exclusively

13  on answering a key question:  What was defendant doing with the

14  money and why?

15     There could have been answers to that question that

16  would not have resulted in prosecution.  But when defendant's

17  motive became clear, which was to cover up the sexual abuse of

18  children, there were no doubts that prosecution was warranted.

19     The statute of limitations did not allow the defendant

20  to be held directly accountable for these crimes, but the

21  defendant through this prosecution has been held accountable

22  for his recent crimes that he committed and his reason for

23  committing them: defendant's illegal structuring of financial

24  transactions to cover up his past abuse.

25     And to be clear, had there been an opportunity for the

1    government to charge the defendant with sexually abusing boys

2    in his care, we would have.  Had there been opportunity to

3    refer this matter to the state for prosecution of those crimes,

4    we would have.

5           But because we were unable to do that, the sentence

6    the defendant receives, whatever the Court decides today, may

7    not bring the amount of punishment that many think the

8    defendant deserves.  The justice in this case comes from the

9    sentence the Court imposes and -- and it comes from the fact

10   that defendant's crimes, all of them, are known and he has been

11   held accountable for them.

12          Had we been able to charge the defendant with sexual

13   abuse crimes, the advisory guideline range would have been

14   substantially higher.  The guidelines in this case, however,

15   are driven entirely by the offense of conviction, structuring

16   financial transactions.

17          The guidelines do not take into account the

18   defendant's crimes against children.  And to many, a sentencing

19   range of zero to six months' imprisonment when the financial

20   crime was motivated by the desire to hide such horrible crimes

21   against children may be illogical and distasteful.  But the law

22   is clear that the guidelines applicable in this case cannot be

23   increased based on that conduct.

24          We are recommending a sentence within the guidelines

25   range determined by the Court.  In making this decision and

1    agreeing not to comment further regarding where within that

2    range an appropriate sentence falls, the government examined

3    the facts we knew at the time the plea was negotiated.  And as

4    we do in all cases, we analyze the risks if the case proceeded

5    to trial.

6          But in this case in particular, because it involved

7    sexual abuse victims, the government paid close attention --

8    close attention to the wishes of one of the victims known at

9    the time, Individual A.  Individual A would have had to testify

10   if this case proceeded to trial.  And Individual A clearly

11   stated that he wanted to protect his anonymity and only

12   publicly testify if there was absolutely no other choice.

13         Trying to respect his decision was a driving force for

14   us in negotiating the plea and agreeing to the sentencing

15   recommendation.

16         If it was at all possible to get to this day of

17   accountability without needing to put Individual A through a

18   trial, we wanted to honor his clearly stated wish, and we have

19   been able to do that.

20         Now, regardless of the guidelines range, the Court is

21   certainly permitted to consider defendant's crimes against

22   children in fashioning an appropriate sentence under

23   Section 3553.

24         And in considering the defendant's history and

25   characteristics, there is no doubt the defendant's conduct

1    while a teacher and coach was horrendous, and there's no way

2    for me to say it any better than what you just heard from

3    Jolene Burdge and Scott Cross.

4            As horrendous as that conduct was decades ago, so was

5    his conduct just last year.

6            After being approached by the government and asked to

7    explain the large cash withdrawals, the defendant had choices.

8    He could have refused to talk to the government.  He could have

9    talked to the government, admitted he had wronged Individual A,

10   and acknowledged he was paying compensation.  Though it would

11   have been illegal in its own right, he could have lied and made

12   up a benign explanation for the cash withdrawals.

13           He did none of those things.  Instead, the defendant

14   chose the worst possible course in order to keep his dark

15   secret of abusing boys quiet.

16           The defendant agreed to record conversations with

17   Individual A after unequivocally telling the government that

18   Individual A's accusations were baseless.  And defendant knew

19   what he was doing.  If Individual A was demanding compensation

20   for an incident that had not occurred, then the demand was

21   wrongful and Individual A was committing extortion.

22           Defendant knew the reason the government sought to

23   record those conversations.  He's not an unsophisticated

24   person.  The defendant knew that when federal agents and

25   prosecutors asked him to record those conversations, it was to

1    gather evidence to build a criminal case against Individual A.

2            And the defendant knew then, as he has now

3    acknowledged, that Individual A's accusations were not

4    baseless; in fact, they were true.  Defendant knew that he was

5    trying to build a criminal case against Individual A, even

6    though Individual A had committed no crime.

7            Defendant knew that he had, in fact, abused

8    Individual A and several other students, and his decision last

9    year was designed to keep his dark secrets hidden by

10   victimizing Individual A all over again.

11           To this day, your Honor, the defendant's efforts to

12   conceal aspects of his dark past continue.  Though he has

13   acknowledged through his guilty plea that he committed past

14   misconduct and lied to the FBI, he continues to deny what

15   should now be obvious to everyone:  Defendant sexually abused

16   Stephen Reinboldt while Reinboldt was a high school student.

17           The sentence the Court imposes should take into

18   account all of the harm defendant has caused, both long ago and

19   recent, and the profound harm that he still refuses to

20   acknowledge.

21           Now, though the sentence the Court ultimately imposes

22   is important, the defendant's punishment should not and will

23   not be the only lasting effect of this prosecution or this

24   proceeding.

25           Defendant's attempt to quietly compensate Individual A

1    by structuring his withdrawals and his attempt last year to

2    frame Individual A show just how desperately defendant wanted

3    to keep his dark secrets.  But he has failed.

4         This process has shined a light on defendant's history

5    of sexual abuse and his efforts to cover it up.  Due to the

6    courage and candid statements of Individual A, Individual B,

7    Individual C, Scott Cross, and Jolene Burdge on her brother's

8    behalf, defendant has been exposed for who he is, and the

9    record can finally be set straight.

10        The light shined on defendant's history of sexual

11   abuse sends a strong message to defendant's victims that has

12   been missing for far too long.  Each victim we talked to said

13   something almost identical:  "In light of the defendant's

14   position, who is going to believe me?  Who would believe me?"

15        Through this process, it should be clear to the

16   victims we do believe you.  You do not stand alone.  What

17   happened to you long ago is now understood and acknowledged by

18   all.  And hopefully victims of others who are afraid to come

19   forward will also see they too will be believed no matter how

20   prominent the abuser.

21        Finally, this proceeding should send a strong message

22   to other perpetrators like the defendant.  Defendant has not

23   gotten away with it, either through the passage of time or his

24   prominent position.  Others' dark secrets will similarly not be

25   safe.  They will be pursued and exposed even if it takes

1   decades and even if we have to use all the lawful tools at our

2   disposal.

3           Your Honor, the defendant has said that today would be

4   the most difficult day of his life, and that is probably true.

5   But for defendant's victims, some of whom you've heard from,

6   their most difficult day was in a motel room or a locker room

7   decades ago.  And they have had to relive that most difficult

8   day over and over and over again in the years that followed.

9           The defendant has argued that the shame of being

10  exposed is punishment enough.  Being exposed may be shameful,

11  but it is not accountability.  The fact that defendant is being

12  sentenced today and the truth has been told both about the

13  uncharged abuse from years ago and the charged crimes that

14  involve covering up that abuse will provide defendant's victims

15  with some measure of justice.

16          We ask that this Court, through the sentence imposed,

17  take all aspects of defendant's history into consideration and

18  that he be held accountable for all of the crimes that he

19  committed.

20          Thank you, your Honor.

21          THE COURT:  All right.  Thank you, Mr. Block.

22          Does the defense wish to argue about the application

23  of the factors set forth in Section 3553(a), request a

24  variance, or otherwise make a sentencing recommendation?

25          MR. GREEN:  Yes, your Honor.

1      THE COURT:  All right.  Mr. Green, you may proceed.

2      MR. GREEN:  May it please your Honor, I am hopeful

3  that my words will be adequate this morning to convey my

4  thoughts as you consider my client's sentence.

5      Let me, sir, say right at the outset to Mr. Cross and

6  to Ms. Burdge and to the others that nothing I say this morning

7  as I advocate on behalf of Mr. Hastert should be interpreted or

8  received by anyone as an attempt to minimize the emotional

9  trauma and lasting injury experienced by any of the individuals

10  who were abused by Mr. Hastert over 30 years ago.  We

11  acknowledge and respect what we have heard here this morning.

12      In a few moments, your Honor, Mr. Hastert will stand

13  before you, convicted by his own admission of one count of

14  structuring withdrawals of cash from a bank.  There is no

15  dispute over the fact that all of the money that Mr. Hastert

16  withdrew belonged to him and was lawfully earned.

17      And, sir, as we cited in our submission as part of the

18  presentence report, rarely, if ever, has there been a sentence

19  of confinement for this kind of structuring.  Having said that,

20  I am well aware that there are other factors that will

21  influence your sentencing decision.  And I am not here

22  attempting to minimize the instances of misconduct that

23  occurred many years ago.

24      But it is also indisputable that thereafter, Dennis

25  Hastert was able to reshape his life into a career of public

1    service and extraordinary accomplishment.

2            So what I am asking, your Honor, is that you take into

3    consideration the entire arc of Mr. Hastert's life, which at

4    this point not only embraces the past, but also Mr. Hastert's

5    prospects for the future.

6            The government has asked, I think, in one of its

7    submissions that you not show Mr. Hastert particular leniency

8    because of who he is or who he was.  I trust that you know,

9    sir, that I am not advocating for that, and Mr. Hastert is not

10   expecting that.

11           What I am asking, however, is that my client not

12   suffer a more severe punishment for the same reason.  Whatever

13   sentence your Honor imposes, it must, as I believe it will,

14   take into account those factors germane to this process.

15           When approximately six years ago a former student of

16   Mr. Hastert returned to confront him about abuse, my client was

17   severely frightened and disoriented.  His instincts were to try

18   to prevent the unraveling of his entire life, and in the grip

19   of these emotions, he made some very poor decisions.

20           I wish he had called for help on that day, but he

21   didn't.

22           I do not have the words to describe the anxiety and

23   the burdens that Mr. Hastert must have carried during the next

24   few years, but all of that must have become almost

25   incapacitating when FBI agents arrived at his home early in the

1    morning of December 8th of 2014 to question him.

2            As that investigation progressed, I'm convinced that

3    Mr. Hastert retreated to what I might call survival instinct.

4    And by that, sir, I mean I believe he remained emotionally

5    incapable of reaching inward at that time to process his prior

6    conduct and to admit the implications to himself, much less to

7    a federal prosecutor and an agent of the FBI, sensing somehow,

8    as I believe he did, in the recesses of his mind that he was

9    threatened really with the destruction of both his reputation

10   and his legacy.

11           I have a little different view of the proffer session

12   because I submit that he was truthful.  My client was truthful

13   regarding the intimidation and the fear that caused him to make

14   the payments to Individual A.  But he did fail to confirm the

15   truth of A's allegation, and his lack of candor in that regard

16   was clearly wrong.

17           But the origins, your Honor, of all that are also

18   complex.  Mr. Hastert was in those moments simply unable to

19   confront his past, and his lawyer at the time could not help

20   him because he did not know the truth.

21           And some or much of that disability lingers today.  A

22   while back, we asked Mr. Hastert to give us names of

23   individuals whom we could contact and ask for letters of

24   support.  We were given the name of Mr. Cross's older brother,

25   Tom.  And someone from my office called and talked to Tom Cross

1    and requested such a letter.

2            And I'm given to believe that that request had some

3    impact on Scott Cross's decision to testify today, but I don't

4    know that of my own personal knowledge.

5            THE COURT:  I thought the first call to Tom Cross was

6    made by the defendant.  Is that incorrect?

7            MR. GREEN:  I don't know.  I thought it was from my

8    office.

9            THE COURT:  I'll ask the government.

10           MR. GREEN:  It may have been from the defendant.

11           THE COURT:  The way I read the government's supplement

12   was the first call was made to Mr. Tom Cross by the defendant.

13           MR. GREEN:  It may have --

14           THE COURT:  Upon not returning the call, the second

15   call was made from someone in your office.

16           MR. GREEN:  It may -- it may well be, your Honor.

17           THE COURT:  Can the government confirm that?

18           MR. BLOCK:  That's what I understand, your Honor, from

19   speaking with Mr. Cross.

20           THE COURT: All right.  Go ahead, Mr. Green.

21           MR. GREEN:  If I may, sir.  But from my perspective,

22   which is gained over talking with Dennis for almost a year, it

23   is inconceivable to me that he would have -- he would have

24   called, if such be the case, Tom Cross or asked us to call Tom

25   Cross were he fully cognizant of the incident that Mr. Scott

1    Cross described this morning.

2           I don't have the medical or psychological expertise to

3    explain that with more precision, but I do believe that aspects

4    of Mr. Hastert's life have been compartmentalized.  Maybe

5    "walled off" is the better term.

6           And while none of that calls into question his

7    competency to be sentenced here this morning, there are

8    deficits, your Honor, which I believe have been exacerbated by

9    his medical condition.

10          You told me at our last status conference -- I think I

11   was on the phone.  You allowed me, graciously, to call in --

12   that you considered my client's behavior with regard to the

13   government's investigation as an aggravating circumstance.

14          I've tried, your Honor.  I've tried to explain to the

15   Court my client's limitations at that time and the context that

16   surrounded the proffer session in the hope that I can persuade

17   you to accept that what happened was not purposeful.

18          The arc of Mr. Hastert's life of which I speak

19   includes many significant contributions to the welfare and

20   security of this country throughout his many years in public

21   office.  He was by all accounts a remarkable leader who

22   governed in a bipartisan manner and through some of this

23   country's most difficult times.

24          He was asked to assume the office of Speaker shortly

25   after the dramatic impeachment hearings involving President

1   Clinton when tensions in the Congress were running at an

2   historic high.

3          Four years later, after four successive balanced

4   budgets and the bipartisan passage of laws such as the funding

5   payment for pharmaceuticals for seniors, what we know as Part D

6   of Medicare, Congress's approval rating was at an all-time

7   high.

8          As we mentioned also in our submission, your Honor,

9   both President Bush and Mr. Hastert were instrumental in

10  leading the response of this country to the September 11

11  attacks.

12         And he was also perhaps the single most important

13  leader in the fight against drugs, in the Congress, coming from

14  South America, so much so that the nation of Colombia honored

15  him with the Cross of San Carlos medal for his work in fighting

16  narco terrorists, and he is the only citizen of this country to

17  have been so honored.

18         Nevertheless, if you were to ask Mr. Hastert to

19  identify his proudest achievement, it would be his family,

20  first Jean, his unbelievably supportive wife of 43 years, and

21  his two wonderful sons, Ethan and Josh.

22         Understandably, Mr. Hastert wanted to spare his family

23  the stress and emotional impact of today's proceeding, both

24  inside and outside this courtroom.  But his sons have come here

25  this morning to demonstrate their support for their father, and

1    I know that Mr. Hastert appreciates that support very much.

2    And it is his family and a very few close friends that have

3    enabled him to endure these last 11 months.

4         And so I would like to take a few moments to direct

5    some comments to this last 11 months.

6         Decades of not just political achievements but also

7    acts of goodness and charity have been erased, a lot of it even

8    physically, as his name has been removed from public places,

9    his portrait in the Capitol sent to storage.

10        All of that achievement and all of these good deeds

11   are no longer acknowledged or perhaps even remembered.  They

12   have been eclipsed by the misconduct that occurred years ago.

13   And my saying that this morning in this courtroom cannot begin

14   to convey the humiliation and hurt experienced by Mr. Hastert.

15        Many of the good and important things that Mr. Hastert

16   did in his life were described and remarked upon in numerous

17   letters sent to your Honor.  A number of those who wrote those

18   letters and who were strong supporters of Mr. Hastert are now

19   reluctant to be identified publicly as his friend, and they

20   have therefore asked their letters be withdrawn.

21        We are enormously grateful to those who have allowed

22   their letters to be filed with the Court, but the withdrawal of

23   so many letters exemplifies the growing isolation and

24   abandonment by former friends and associates.

25        As your Honor knows, days following the entry of his

1    guilty plea, Mr. Hastert suffered a stroke, a very serious

2    blood disease, back surgeries, and other complications that in

3    the opinion of his physician brought him close to his demise.

4    He has been moved back from that brink, but he is still

5    substantially physically compromised, incapable of caring for

6    himself, and exhibits numerous and current medical

7    complications.

8        All of that has been confirmed by the examination and

9    report of Dr. Golden, who was asked by the Court to make an

10   independent medical assessment of my client's health.

11       One of Dr. Golden's principal concerns was whether the

12   Bureau of Prisons personnel could adequately attend to all of

13   Mr. Hastert's issues and would be able to detect signs of

14   deterioration in his medical condition.

15       Dr. Harvey, a regional medical director of the Bureau

16   of Prisons, assured Dr. Golden that all appropriate treatment

17   is available.  But I say respectfully, sir, I would have

18   expected that response because I do not believe that the Bureau

19   of Prisons would ever publicly concede that it is incapable of

20   providing adequate treatment and care for anyone in the system.

21       The letter we submitted from Mr. Phillip Wise,

22   formerly the assistant director for health services at the

23   Bureau of Prisons, does raise serious issues relating to both

24   adequacy of medical care, much of which would be provided by

25   fellow inmates, and issues relating to Mr. Hastert's physical

1    safety.

2            Care for Mr. Hastert will also be adversely impacted

3    in light of problems with Bureau of Prisons overcrowding and

4    understaffing, and Mr. Wise is also concerned that Mr. Hastert

5    will not have access to his present medications, a problem

6    Dr. Harvey acknowledged.

7            There is no doubt, sir, that today Mr. Hastert is

8    receiving the care he needs.  No one knows how extensive or

9    successful his recovery will be or the degree to which his

10   health has been or will be permanently compromised.

11           But I am hopeful, your Honor, that in considering an

12   appropriate sentence, your sentence will not increase the risks

13   to Mr. Hastert's health and present additional risks to his

14   physical security.  And I ask you to please take all of that

15   into consideration.

16           This case, sir, has been one of the most tragic and

17   sad cases I have ever encountered.  I have genuine compassion

18   for all the victims, but I also have a great deal of compassion

19   for Mr. Hastert, whose life will forever be compromised and

20   diminished in every way possible.

21           When John and I went to visit Mr. Hastert yesterday, I

22   found it hard to contend with the reality, sir, that he sits

23   alone at home, confined to a wheelchair, unable to care for

24   himself, isolated from society, with a reputation markedly

25   different from the one he enjoyed for so many years.

1      I think it's important that you know that we have been

2   discussing with Mr. Hastert the need for him to revisit this

3   earlier part of his life so that he can begin to unravel the

4   origins of his misconduct and understand how adversely it has

5   impacted him and the victims.

6      It is my hope and Mr. Hastert's hope and God willing

7   that he will regain the physical strength needed to begin that

8   process.

9      So, sir, I ask myself, now that the arc of Dennis

10   Hastert's life has risen and then fallen to its lowest point,

11   can I stand here and submit to you that what has happened to

12   him is indeed punishment.  And, if so, is it enough punishment?

13   Does justice require that more is necessary to punish for the

14   offense of conviction?  To deter?  To protect the public?

15      In both my heart and my mind, I do not believe that

16   more is necessary.  I'm asking your Honor to conclude that

17   confinement in a prison is neither required under the law nor

18   necessary to show society's disapprobation.  Additional

19   punishment to that already visited is not necessary.

20      I ask you, sir, to sentence Mr. Hastert to a term of

21   probation.  And if you feel that more is required, I ask that

22   any sentence be served as home confinement so that he may

23   receive the humane care he urgently needs.

24      If there is to be a fine, your Honor, I ask that it be

25   within the guideline range.

1          Thank you, sir.

2          THE COURT:  Thank you, Mr. Green.

3          Mr. Hastert, you have an opportunity to make a

4    statement to the Court if you wish.  If you choose not to do

5    so, I won't hold it against you, but this is your opportunity

6    to talk to me if you wish to.

7          If you want to do it from your chair, you're free to

8    do so as long as the microphone is in front of you.  If you

9    want to get up, you can come up here and do it at the podium.

10   But I'm fine either way.

11         THE DEFENDANT:  Thank you, your Honor.

12         I would ask your leave that I -- I've written down a

13   statement, and I would like to read it.

14         THE COURT:  Of course.

15         THE DEFENDANT:  And I don't --

16         THE COURT:  You may.

17         THE DEFENDANT:  -- want to miss anything.  So ...

18         THE COURT:  Please do.

19         THE DEFENDANT:  I'm deeply ashamed to be standing here

20   before you today.  I am the one solely responsible for being

21   here.  I know I am here because I mistreated some of my

22   athletes that I coached and because I structured withdrawals

23   from the bank in the hope of keeping mistreatment hidden, and

24   also I misled the FBI in 2015 about what happened in the past.

25         For 11 months, I have been struggling to come to terms

with events that occurred almost four decades ago. I have more
work to do in that regard. But I also committed to doing it
and doing it with the help of professionals. I am now working
to regain my health back.

The thing I want to do today is say I'm sorry to those
I have hurt and misled. First I wanted to apologize for the
boys I mistreated when I was their coach. What I did was
wrong, and I regret it. They looked to me, and I took
advantage of them. Today I accept what Ms. Burdge and
Mr. Cross have said, and I apologize to them and to their
families.

I also want to apologize to the government for
misleading them in my interviews in December 2014 and February
of 2015. Federal agencies I deeply respect were misled by me.
This alone is a source of great shame for me.

I apologize to my constituents and my supporters, who
I tried to serve honorably for so many years, and also my
colleagues who I served with.

I apologize to my family and friends for my being here
and for subjecting them to everything that has happened in the
past 11 months. They lost their privacy, and my family members
lost positive association with the family name.

I'm so very thankful for everything that my wife Jean
and my sons Ethan and Josh have done to support me and to take
care of me during this illness.

1      I apologize to the Court and to the people of the

2  United States and stand here ready to accept the sentence that

3  you are about to impose on me.

4      Thank you, Judge Durkin, for listening to these

5  statements.

6      THE COURT:  Mr. Green, your client doesn't have to

7  answer the question, but I have a question --

8      MR. GREEN:  Yes, sir.

9      THE COURT:  -- of Mr. Hastert.  And he's free to

10 answer it, but he can talk to you first.

11      You said you mistreated athletes.  Did you sexually

12 abuse Mr. Cross?

13      THE DEFENDANT:  I -- I don't remember doing that, but

14 I accept the statement.

15      THE COURT:  Did you sexually abuse Victim B?

16      THE DEFENDANT:  Yes.

17      THE COURT:  All right.

18      All right.  And how about Mr. Reinboldt?  Did you

19 sexually abuse him?

20      THE DEFENDANT:  It was a different situation, sir.

21      THE COURT:  If you want to elaborate, this is the time

22 to do it.

23     (Counsel and defendant conferring.)

24      THE DEFENDANT:  I -- I would accept Ms. Burdge's

25 statement.

1              THE COURT:  So you did sexually abuse him.

2              THE DEFENDANT:  Yes.

3              THE COURT:  All right.  Okay.

4          You can have a seat, unless there's anything else you

5      want to add.

6              MR. GREEN:  No, sir.

7              THE COURT:  Mr. Green, anything else you wish to say?

8              MR. GREEN:  No, sir, not at this time.

9              THE COURT:  Anything else from the government?

10             MR. BLOCK:  No, your Honor.

11             THE COURT:  All right.  You can all have a seat.

12         First thing I intend to do is impose conditions of

13     supervised release.  And I'm going to go through those

14     conditions, make sure the defendant understands them and make

15     sure that the -- if there is an objection from either side, I

16     hear what those objections are and I'll rule on them.

17         I'm going to impose a period of supervised release of

18     two years.  I'll deal with the issue of custody in a moment.

19         Within 72 hours of any release from custody of the

20     Bureau of Prisons, the defendant shall report in person to the

21     probation office in the district in which he is released.

22         He should comply with the following mandatory

23     conditions of supervised release:

24         He should not commit another federal, state, or local

25     crime; not unlawfully possess a controlled substance; and

1   cooperate in the collection of a DNA sample if the collection

2   of such a sample is required by law.

3        These are mandatory conditions that the law requires,

4   and no further explanation is needed.

5        The defendant is also required to comply with the

6   following discretionary conditions of supervised release:

7        Defendant shall refrain from knowingly meeting or

8   communicating with any person whom the defendant knows to be

9   engaged or plan to be engaged in criminal activity and from

10  knowingly meeting or communicating with the following persons:

11  Individual A, Individual B, Individual C, and Mr. Cross.

12       He shall refrain -- and that's necessary because these

13  were victims of the defendant, and he should not contact them.

14  If they want to reach out to him, that's their prerogative, but

15  he should never contact them himself.  And that's necessary to

16  protect the victims.

17       Should refrain from possessing a firearm, destructive

18  device, or other dangerous weapon because he's a convicted

19  felon, and possession of such items is itself a crime.

20       He should remain within the jurisdiction where the

21  defendant is being supervised, with a map being provided to the

22  defendant by the probation officer at the inception of the

23  supervised release period, unless granted permission to leave

24  by the Court or probation officer.

25       This is necessary so they know where he is, so they

1    can report on his activities while he's on supervised release.

2           He should report to a probation officer as directed by

3    the Court or a probation officer.

4           He should permit a probation officer to visit him at

5    any reasonable time at home or any other reasonable location

6    specified by the probation officer and permit confiscation of

7    any contraband observed in plain view of the probation officer.

8           This is necessary, again, to allow the probation

9    officer to keep track of what the defendant is doing.

10           Should notify a probation officer promptly, within

11   72 hours, of any change in residence, employer, or workplace

12   and, absent constitutional or other legal privilege, answer

13   inquiries by a probation officer; and he should also notify the

14   probation officer promptly, within 72 hours, if arrested or

15   questioned by a law enforcement officer.

16           These are the general conditions of supervised

17   release.  Are there any objections from the defendant to those?

18           MR. GREEN:  No, sir.

19           THE COURT:  All right.  I'm also going to impose the

20   following special conditions of supervised release, and these

21   are necessary because of the defendant's history of sexual

22   misconduct.

23           He shall participate in a sex offender treatment

24   program.  The specific program and provider will be determined

25   by a probation officer.  The defendant shall comply with all

1    recommended treatment, which may include psychological and

2    physiological testing.

3              Is there any objection to that condition by the

4    defense?

5              MR. GREEN:  No, sir.

6              THE COURT:  All right.

7              And, finally, if the probation officer determines that

8    the defendant poses a risk to another person, including an

9    organization or members of the community, the probation officer

10   may require you to tell the person about the risk.  You must

11   comply with that instruction.  Such notification could include

12   advising the person about your record of arrests and

13   convictions, and the probation officer may contact the person

14   and confirm that you have told the person about the risk.

15             Any objection to that condition?

16             MR. GREEN:  No, sir.

17             THE COURT:  All right.

18             Are there any other conditions of supervised release

19   that the government is recommending that I have not imposed?

20             MR. BLOCK:  No, your Honor.

21             THE COURT:  Any that the probation officer is aware of

22   that I should -- that you recommend I impose?

23             MS. KIECKHAFER:  No, your Honor.

24             THE COURT:  All right.  Those will be the conditions

25   of supervised release.

1          The Supreme Court in an opinion issued exactly one

2   week ago today, in the case *Molina-Martinez v. United States*,

3   said that the sentencing guidelines are to be the sentencing

4   court's starting point and initial benchmark.  The district

5   court must begin its analysis with the guidelines and remain

6   cognizant of them throughout the sentencing process.  The

7   guidelines are the framework for sentencing and anchor the

8   district court's discretion.

9          Even if the sentencing judge sees a reason to vary

10  from the guidelines, I need to use the sentencing range as the

11  beginning point to explain the decision to deviate from it.

12  The guidelines in a real sense are the basis for any sentence.

13         The Supreme Court said the guidelines are not only the

14  starting point for most sentencing proceedings but also the

15  lodestar.  Court noted that in less than 20 percent of the

16  cases since 2007 have district courts imposed sentences above

17  or below guideline sentences absent a government motion

18  relating to cooperation.

19         In the three and a half years I've been a federal

20  judge, I've sentenced about 45 defendants.  I can think of only

21  two instances where I've gone above the government's

22  recommendation and a number of times where I have gone below

23  the government's recommendation.  But the facts of each case

24  are, of course, different.

25         I have the discretion to vary the sentence either

1    above or below the guideline range because the guideline range
2    is advisory and not mandatory.

3            I'm required to consider the Section 3553(a) factors I
4    set forth earlier and impose a sentence that's sufficient, but
5    not greater than necessary, to comply with the purposes of
6    sentencing.

7            There may be some question as to why allegations and
8    admissions of sexual molestation of children have any basis and
9    any business being considered in a federal sentencing
10   proceeding relating to a structuring offense.

11           When a defendant is sentenced, Congress provided that
12   "no limitation shall be placed on the information concerning
13   the background, character, and conduct of a person convicted of
14   an offense which a court of the United States may receive and
15   consider for the purpose of imposing an appropriate sentence."

16           The only limits on this are expressly enumerated.
17   Characteristics like race, national origin, and religion may
18   not be considered at sentencing, and whatever information is
19   considered, it must be accurate.

20           The burden of proof as to the accuracy at the
21   sentencing hearing is by the standard of a preponderance of the
22   evidence, and any findings I make today will be pursuant to
23   that standard, noting that as to some conduct, the defendant
24   himself has not challenged its accuracy.

25           The law requires I consider a number of factors when

1    sentencing any defendant.  And among those factors are the

2    history and characteristics of the defendant and the nature and

3    circumstances of the offensive.

4         If I am going to consider the good history and

5    characteristics of the defendant, I must also consider the bad,

6    which is that the defendant is a serial child molester.  And

7    the nature and circumstances of the offense include the child

8    molestation because it was unquestionably the motive for the

9    structuring and the lies that followed it.

10        The motive itself is an aggravating factor.  One

11   reason the motive aggravates the underlying crime of conviction

12   is because the sex abuse was and is conduct that the public

13   should know about -- conduct about children under the

14   supervision and care of an adult -- and concealing it, no

15   matter how old, hides something important.

16        The first thing I must consider under Section 3553(a)

17   is the nature and circumstances of the offense.  The

18   structuring offense, although obviously a federal felony, is

19   not typically a charge that's brought when the funds that are

20   the subject of structuring are lawfully obtained and properly

21   taxed, which was the case here.

22        But I don't in any way criticize the FBI, the IRS, or

23   the U.S. Attorney's Office for conducting the investigation.

24   In this case, from June 2010 to April 2012, the former Speaker

25   of the House of Representatives made 15 $50,000 cash

1  withdrawals from three different banks.

2  In April 2012, when the banks questioned him about the

3  withdrawals and explained that Currency Transaction Reports

4  were being filed, the defendant challenged the bank and lied by

5  saying he was using the cash to buy antique cars and buying

6  stocks and then said he just wanted to make sure his money was

7  fully insured.

8  All of these explanations were preposterous.  When

9  told that cash transactions greater than $10,000 had to have

10  paperwork filed relating to them, he decided to make his

11  withdrawals in amounts less than $10,000.

12  From July 2012 to December 6, 2014, the defendant

13  withdrew $952,000 in cash on 106 separate occasions, each time

14  withdrawing less than $10,000.  The sheer time and effort

15  required to accomplish these transactions is mind-boggling.

16  In total, from 2010 to 2014, a total of 1.7 million in

17  cash was withdrawn from various bank accounts and paid to

18  Victim A.

19  And I'm calling him Victim A because these people are

20  victims.  They're not individuals; they're victims.

21  There should be no mistake that what the defendant did

22  regarding the structuring laws was a crime.  It doesn't matter

23  that it was his money, that it was lawfully earned, and it was

24  properly taxed.  The legislative history of the law, which I

25  have reviewed, makes clear that the Congress intended the law

1    to apply to your situation.  There's no intent by Congress to

2    draw a distinction between structuring where the money was

3    derived from illegal transactions and schemes and money based

4    on legitimately earned funds.

5         The courts have held that intentional violations of

6    the reporting requirements constitute criminal conduct

7    regardless of the core legality of the money at issue.  The

8    7th Circuit in *United States v. Davenport* said, "The statute

9    clearly condemns the act of evasive structuring, regardless of

10   whether the money involved is 'dirty' or not.  It is hard to

11   imagine how the language could be clearer.  If Congress had

12   intended that structuring for the purpose of evading reporting

13   requirements would be illegal only when connected to other

14   criminal conduct, it could easily have done so."

15        And to the extent the defendant didn't know this law,

16   which is of course, again, preposterous, he was given what was

17   called a CTR Reference Guide by his bank when they questioned

18   all of his $50,000 cash withdrawals.  It was written in plain,

19   simple English, not in complicated legalese.  It was a one-page

20   document.  And part of it read as follows:

21       "Q:  Can I break up my currency transactions into multiple

22        smaller amounts to avoid being reported to the government?

23       "A:  No.  This is called 'structuring.'  Federal law makes

24        it a crime to break up transactions into smaller amounts

25        for the purpose of evading the CTR reporting requirement,

1      and this may lead to a required disclosure from the

2      financial institution to the government.  Structuring

3      transactions to prevent a CTR from being reported can

4      result in imprisonment for not more than five years and/or

5      a fine of up to $250,000."

6           The government very appropriately investigated this

7      case.  What rational person takes out $1.7 million in cash out

8      of a bank over four and a half years in a series of 50,000 and

9      $9,000 withdrawals?

10          Add to it that the person who is doing it is the

11     former Speaker of the House, and you have a set of

12     circumstances that cry out for investigation.

13          I don't care whether the money was lawfully obtained,

14     which it was.  I don't care whether the money was fully taxed,

15     which it was.  I don't care if people think this regulation is

16     ill-advised and not meant for people who are dealing in

17     lawfully obtained and fully taxed cash.  I don't care if people

18     think it ought to only be used against drug dealers.

19          The structuring law was known by the defendant.  He

20     had some role in passing it.  And to the extent he was ignorant

21     of it, the bank fully advised him what the law was, and then he

22     proceeded to find ways to work around the law.  That law

23     applies to every citizen, and the prosecution of the defendant

24     for violating that law was entirely appropriate.

25          And the defendant was appropriately charged in this

1    case.  In my 13 years as an Assistant U.S. Attorney and

2    20 years as a defense attorney and the three and a half years

3    I've been a judge, I have never seen a more obvious and

4    clear-cut violation of the criminal structuring laws.

5           Now, structuring, the offense the defendant has pled

6    guilty to, takes its character from the underlying conduct.

7    And the underlying conduct was the sordid secret that the

8    defendant was worried would be exposed, that the defendant was

9    a serial child molester.

10          So special agents of the FBI and the IRS spent the

11   time and effort to track down all of these transactions.  At

12   this point the FBI knew nothing of Victim A.  All the FBI knew

13   was that the former Speaker of the House had withdrawn

14   extraordinary amounts of cash from a number of banks in a

15   manner obviously intended to evade federal reporting

16   requirements.

17          But the effort to prevent the banks from filing proper

18   reports was almost beside the point.  The FBI's immediate and

19   understandable question was, what on earth is going on?  Is the

20   former Speaker of the House, and someone who was engaged in

21   international lobbying since his time in public service, the

22   victim of some extortion or blackmail plot by a foreign

23   government or foreign entity?

24          Was this person who was privy at one time to the

25   nation's greatest secrets involved in some type of official

1  misconduct dating back to his years with the government?  Was

2  there some type of national security problem involved in light

3  of the size of the withdrawals?

4       Remember, these weren't checks; they're not money

5  orders; they were not wire transfers.  This is cash.  Common

6  sense tells you you don't pull out cash out of a bank in these

7  amounts and with this frequency unless there's something

8  nefarious going on.  That's why there are reporting

9  requirements for these transactions.

10       It's possible there will be an innocent explanation.

11  Cash is legal, of course.  People can be eccentric, but that's

12  the exception, and no one ever thought the defendant as being

13  an eccentric person.

14       So it's perfectly understandable that law enforcement

15  would have been concerned by the defendant's cash withdrawals.

16  So once they learned of the scope of the cash withdrawals, the

17  FBI interviewed the defendant at his home.  He didn't know they

18  were coming, but the FBI is not legally required to provide

19  advance notice of an interview to give a person time to lawyer

20  up.

21       And since the FBI believed the defendant might have

22  been compromised in some way, it would have been unwise to

23  inform him in advance of the visit, not knowing if making an

24  appointment itself would put the defendant in danger.  Whatever

25  the government's intent, whether they knew he was obviously

1    engaged in structuring, which I believe they were, whether they

2    were trying to find out what the explanation for all this was,

3    which certainly was one of their purposes, they were acting

4    well within their rights as investigators.

5           The interview was taped without the knowledge of the

6    defendant, and that is perfectly legal and ensures there is no

7    ambiguity about what was said.

8           Every person has three choices when interviewed by the

9    FBI.  The first, of course, is to tell the truth.  Now, if the

10   truth is incriminating, embarrassing, shameful, or

11   uncomfortable, so be it.  It's still the truth.

12          Your second option is to exercise your right to have a

13   lawyer present before you answer any questions.  Even the most

14   unsophisticated individual is aware of this right.  The

15   defendant is, of course, not unsophisticated.  If you don't

16   want to talk to the FBI because of fear or shame in disclosing

17   the truth, then you say you want a lawyer and you don't want to

18   discuss things further.

19          I listened to the tape recording of that interview a

20   number of times.  I relied on the tape and not on the

21   transcripts, so I know exactly what was said and, more

22   importantly, know the mood and tone of the interview.

23          There is no question in my mind the defendant knew he

24   was in trouble because he might have to disclose the secret he

25   didn't want to tell anyone.  He knew about his dark side, but

1    the FBI didn't.  This is apparent from the first question they

2    asked the defendant, which was "Are you and your family safe?"

3            The FBI was doing its job, investigating whether the

4    former Speaker of the House and current international lobbyist

5    had gotten himself in a bad or compromised position with a

6    foreign government or criminals.  So the FBI is doing its job,

7    and the defendant chooses neither to tell the truth nor ask

8    that questioning stop until he gets a lawyer.  Instead, he

9    takes the third option and lies.

10            One factor judges look at in a sentencing is to see if

11   the crime was a one-time lapse in an otherwise exemplary life.

12   This is one of many moments in this case where the defendant

13   had a choice, and he chose the wrong path.

14            Now, in the defendant's submissions to the Court, his

15   counsel has done a commendable job of trying to slice and dice

16   the defendant's conversations with the FBI to show that the

17   questions were not perfectly phrased, that it was a fluid

18   interchange, and that the defendant's answers were ambiguous.

19            Certainly interviews are not conducted in the same

20   type of formal atmosphere present in the courtroom where

21   questions are properly phrased, answers are precise, and a

22   judge referees the situation so there are no misunderstandings.

23   Instead, interviews are conducted in the real world.

24            As I said, I listened to the tape a number of times.

25   There is no question in my mind, and I specifically find the

1  defendant lied and intentionally misled the FBI as to the

2  reason he took the cash out of the banks.  And in his plea

3  agreement, he admitted that he intentionally concealed from the

4  agents that he withdrew the $1.7 million over the last four and

5  a half years to compensate Victim A and concealed the reason he

6  was compensating Victim A.

7          When he said he was keeping the cash in a safe place,

8  he made the statements to mislead the agents as to the actual

9  purpose of the withdrawals and what he had done with the money.

10  And lying is not an acceptable option.  It's not an acceptable

11  option for the uneducated or poorly educated defendants that

12  come before me, and it's not an acceptable option for someone

13  as sophisticated and as intelligent as the former Speaker of

14  the House of Representatives of the United States Congress.

15          If you told the truth, I'm not sure we'd be here

16  today.  Instead you lied, and here we are.  You didn't take the

17  cash out of the bank because you didn't trust banks.  You

18  didn't take the money out of the bank to buy antique cars.  You

19  took the money out of the bank to pay a person you sexually

20  abused many years ago.  I can understand why you didn't want to

21  admit that to the FBI, and in that case, you should have sought

22  the advice of a lawyer before you answered.

23          But when you decided to answer, you assumed the

24  obligation to tell the truth or else commit a federal felony.

25  You chose the latter.  That conduct is more serious than your

1    decision to illegally structure withdrawals of legally earned

2    and fully taxed money.

3              And why is it serious?  Lying to the FBI is not a new

4    law.  Its origins date back to a statute enacted in 1863, and

5    the current version of the law has been in place since 1948.

6    There have been countless convictions across the country of

7    people who have lied to the FBI and thereby been found guilty

8    of a violation of 18 U.S.C. 1001.  This is not some new

9    designer regulation that a naive and unsophisticated person

10   fell prey to.  Congress made lying to the FBI a felony because

11   of the chaos that would ensue if people thought they could lie

12   and get away with it.

13             The FBI investigates serious crimes.  They investigate

14   not only wrongdoing that has already occurred, but just as

15   importantly, they conduct investigations to prevent harm from

16   occurring in the future.  There's only so many FBI agents

17   available, and they don't lack for assignments.  It is an

18   enormous and dangerous waste of resources for the FBI to spend

19   time on a wild goose chase based on lies, and that is what the

20   defendant caused to happen in this case.  It's even more

21   deplorable when it's caused by a person who knew better.

22             Were this only a case about structuring of funds which

23   were legally obtained and taxed, there is some question whether

24   the prosecution would have occurred.  And even if the

25   prosecution had occurred, a sentence of probation would likely

1    be appropriate.

2        I asked the U.S. Sentencing Commission for data

3    regarding sentences imposed across the country on offenders

4    sentenced for structuring transactions.  I specifically asked

5    for those sentences where the safe harbor applied where the

6    funds were not from an illegal source and were not used for

7    unlawful purposes.

8        Out of the 78 offenders sentenced between years 2010

9    and 2014, 65 of those offenders received probation, four

10   offenders received some type of split sentence involving

11   community confinement and imprisonment, and only nine of the 78

12   offenders were actually sentenced to a period of straight

13   incarceration.

14       I then asked them to run data -- the same data, only

15   calculating it for people who had no criminal history at all.

16   Of the 66 offenders in that category, only seven received a

17   period of incarceration, and even then, the average length of

18   imprisonment was four months.

19       This case is different from those cases.  Accusing

20   Victim A of extorting you was unconscionable.  You tried to set

21   him up.  You tried to frame him.  Because you told the FBI that

22   Victim A was falsely accusing you of child molestation, the

23   government pulled Victim A's bank records, put a pen register

24   on his phone lines, pulled toll records, pulled phone records,

25   surveilled him, and pulled bank records of his family.

1      The full weight of the federal government's

2   investigative resources were thrown at him.  You caused that;

3   no one else did.  And he didn't deserve it.  He was a victim

4   once decades ago, and you tried to make him a victim again.

5      There are things we try to protect in our society, and

6   we try to protect people from being falsely accused of crimes.

7   You were willing to use your credibility and your stature as

8   the former Speaker of the House of Representatives to convince

9   the government you were being extorted.  You manipulated the

10  FBI and the U.S. Attorney's Office, and that's a big problem

11  for you.

12      You also lied about not sexually abusing other members

13  of the wrestling team.  Your admission to the accusations of

14  Victims B and D showed the lie.  And you made those lies to

15  make your lie about Victim A more credible.  The parties have

16  agreed that your statements to the government can be considered

17  by me, and I find this an extremely aggravating factor that

18  sets this case apart from garden-variety structuring cases.

19      Your attorney has suggested that somehow at the time

20  that was going on, you were somehow -- I don't know it would be

21  mentally compromised, but in a position where you didn't

22  understand what was going on and were making poor decisions.

23  At the time this was going on, sir, you were a lobbyist with

24  Dickstein & Shapiro, a large D.C. firm.  And I'm simply going

25  to read what was reported in the presentence report at that

1    time.

2          You were paid $75,000 a month.  I don't believe you

3    were mentally compromised and didn't know what you were doing.

4    "The defendant reported he was employed as a senior adviser and

5    voluntarily ceased this employment subsequent to the filing of

6    the indictment in the instant case."  So you worked there until

7    May of 2015.

8          According to the defendant's bond report prepared by

9    the U.S. Pretrial Services Office, "The defendant reported he

10   has traveled extensively for business between approximately

11   2005 and 2015.  Specifically, he related he traveled to Japan

12   in May 2015.  He has also traveled to Singapore, China, Korea,

13   Turkey, Luxembourg, Germany, England, Colombia, Brazil,

14   Lithuania, Canada, Panama, and Peru."

15         I believe the actions you took when you tried to set

16   up Victim A were intentional, were thought-out, were desperate,

17   but were not something you didn't -- where you didn't know what

18   you were doing.

19         I received many letters in this case, and I read every

20   one of them.  But there was one that struck me as particularly

21   appropriate.  It was from SNAP, Survivors Network of those

22   Abused by Priests, letter I received April 25th.  And I'll read

23   one paragraph of it:

24         "Denny Hastert dramatically increased suffering to his

25   victims by his false allegations that one of his victims was

1    extorting money from him.  The deliberate and calculated

2    deception might have ended differently.  The one-time victim

3    who Hastert sexually violated and robbed of his innocence had

4    already suffered for decades but might have also ended up in

5    prison.

6              "Hastert tried to portray himself as the victim and

7    someone who needed law enforcement's help, falsely claiming

8    that someone was extorting money from him.  As a powerful

9    politician, he may have succeeded and Victim A may have been

10   forced to endure horrific additional suffering, being indicted

11   and punished for a crime he didn't commit.  Hastert was willing

12   to allow that to happen, even potentially sending an innocent

13   man to jail, in an effort to deep his dirty secrets hidden."

14             I agree with that letter.

15             Now, one of the other factors I must consider is the

16   history and characteristics of the defendant.  Your lawyers

17   have presented your public side, which is a lifetime of good

18   works in service to the community.  I don't take a cynical view

19   of people who serve in the legislature.  The political side of

20   public service often obscures the good that elected officials

21   do.

22             There are public servants who often sacrifice what

23   could be an easier or more lucrative existence in the private

24   world in order to help their constituents.  The best of them

25   know that the position is greater than the person and treat the

1    job with respect.  We are a great nation because people do

2    that, and I admire people who are willing to make that

3    sacrifice.  You made that sacrifice.

4         Those who are leaders among legislators are the most

5    admired and respected by members of the community.  The Speaker

6    of the House is among the most respected positions that any

7    United States citizen can hold.  Indeed, it's also one of the

8    most powerful by virtue of the number of circumstances,

9    including the laws of presidential succession.

10        The letters that I received in support of the

11   defendant were what I would have expected.  I received one as

12   recently as this morning.  They describe an exemplary person in

13   all his personal, professional, and political dealings.  A

14   large number of people respect him, and he's done numerous

15   things that should be respected.  There are many tales of good

16   deeds, both large and small.  People described how their lives

17   were positively impacted by being in contact with Dennis

18   Hastert, even after his public service ended.

19        He cared deeply and worked effectively for his country

20   and his congressional constituents.  Letters I received came

21   from all walks of life, and they're filled with examples of

22   good deeds, and they're often unsolicited good deeds performed

23   by the defendant.  These are from people who worked with him,

24   people would worked for him, and people who simply knew him

25   from the community.  It is unquestioned that he has done a lot

1   of good for people, and no rational, unbiased person who read

2   the many letters regarding him that I received would feel

3   differently.

4           The irony is that many of the letters came from people

5   that Mr. Hastert taught and coached in high school.  Letters

6   described him having made a positive impact on their lives.

7   Many of the people who wrote were from his former staff, and

8   others had jobs in the capital.  They all viewed him simply as

9   "a good man."

10          I received a poignant letter from the defendant's wife

11  and heartfelt, well-written letters by his sons.  They describe

12  the defendant as a good husband and a good father.

13          Just as I was besieged by letters about the good of

14  Dennis Hastert, I must also consider the bad.

15          Positions of power and respect do not insulate a

16  person from being held accountable for violations of the law.

17  A person should not be unduly prosecuted and penalized because

18  he was once powerful and influential.  Similarly, a person is

19  not entitled to any greater deference or privileges than any

20  other citizen who commits criminal acts.

21          Some actions can obliterate a lifetime of good works.

22  Nothing is more stunning than having the words "serial child

23  molester" and "Speaker of the House" in the same sentence.

24  Nothing is more disturbing than having the words "child

25  molester" and "coach" and "teacher" in the same sentence.  Both

1    sentences are true.

2            Your actions with the young people you abused violated

3    the trust that students put in their teachers, their coaches,

4    and their mentors.  Your actions were cynical.  You abused

5    those who either wouldn't or couldn't cry out for fear they

6    would not be believed and were trying to discredit a beloved

7    coach, or for fear they would be ostracized by their friends.

8            How many teenagers simply want to fit in?  How many

9    teenagers simply don't want to be embarrassed, don't want to

10   have the light shined on them, and just want to be part of a

11   crowd?  Can you imagine the whispers, the finger-pointing, the

12   sideways glances if you're a 14-year-old boy and you accuse the

13   town hero of molesting you?

14           Anyone who lived in the '70s knows it's different than

15   today.  Today no one would let a coach sit in a chair in front

16   of the boys' shower.  But in the '70s, when you were the coach

17   who brought the school a state wrestling championship, you

18   could get away with that stuff.  Back then, people blindly put

19   their trust in kids' teachers and coaches.  And your breaking

20   of that bond of trust is all the worse because of who you were.

21           Parents are going to think twice about the safety of

22   their children with teachers and coaches because if Denny

23   Hastert, Speaker of the House, everybody's friend, everyman,

24   could do it, then anyone could do it.

25           There's a suggestion in the defense submission that

1  the actions of the defendant relating to Victim A were

2  ambiguous.  I reject that characterization.

3       The undisputed facts are these.  In the late '70s, the

4  defendant took 10 to 14 boys from the Yorkville High School

5  wrestling team to a wrestling camp in Colorado.  Victim A was

6  younger than many of the other boys on the trip.  During the

7  trip, the team stayed two nights in a motel during the drive

8  back.

9       When they arrived at the motel, the other boys teased

10 Victim A, saying that he would have to spend the night in the

11 defendant's room.  Victim A didn't know why the other boys were

12 teasing him, and he was not concerned about it because he had

13 known the defendant since he was seven years old and the

14 defendant was a friend of his family.

15      Later, the defendant did tell the boys that they would

16 all stay in a room together while Victim A would stay with him.

17 Victim A didn't understand why he was singled out to go to the

18 room with the defendant.

19      When it was time for bed, Victim A went to the

20 defendant's room.  Earlier in the trip, Victim A had complained

21 about a groin pull.  While in the hotel room, the defendant

22 asked about Victim A's injury and said he wanted to check on

23 it.

24      The defendant told Victim A to lie down on the bed and

25 take off his underwear.  The defendant then began massaging

1    Victim A's groin area.  It became clear to Victim A that the

2    defendant was not touching him in a therapeutic manner to

3    address a wrestling injury but instead was touching him in an

4    inappropriate sexual way.

5           A few moments later, this 14-year-old jumped off the

6    bed, grabbed his underwear, ran across the room, and slunk into

7    a chair.  He was confused and embarrassed about his physical

8    reaction to being touched, and he actually apologized to the

9    defendant.

10          The defendant then asked Victim A to get on the

11   defendant's back and give him a massage.  Victim A was nervous

12   about what happened and what was going on and didn't know what

13   to do.  The defendant lay on the bed in only his underwear, and

14   Victim A gave him a back massage.  Then they went to sleep in

15   the same bed.

16          This occurred the summer before Victim A's freshman

17   year in high school.  He had just left eighth grade.  He was

18   14 years old.  There is nothing ambiguous about this.  This is

19   child molestation.  It was sexual abuse.

20          And if there is anyone who thinks there is anything

21   ambiguous about that recitation, the ambiguity melts away when

22   the conduct of the other victims is factored in.  The defendant

23   performed a sex act on Victim B.  The defendant doesn't deny

24   it.  The defendant performed a sex act on Mr. Cross.  We heard

25   that today.  There's nothing accidental or ambiguous about the

1　molestation of Victim A, period.

2　　　　And if in your own mind you didn't abuse Victim A, why

3　pay him $3.5 million?  Because of fear he would reveal it and

4　ruin you?  I don't buy it.  If there's no truth to it, then

5　there is no ruin.  It's just the unsupported allegations of

6　someone decades too late.

7　　　　You weren't running for public office then when

8　Victim A approached you.  I believe you weren't afraid of being

9　ruined because of unsupported allegations.  You were afraid

10　that the rest of the victims would come forward if Victim A

11　did.  And if the rest of the victims came forward, then the

12　secret is out, and the victims will finally be believed.

13　　　　The obvious motive for your lies is not lost on me.

14　If you didn't hide this and keep it a secret, you never would

15　have been a state representative; you never would have been a

16　congressional representative; you never would have been Speaker

17　of the House.

18　　　　I also find aggravating that a person with your

19　education and background engaged in the crimes here.  I can't

20　tell you how many defendants come before me, standing right at

21　that podium, come from broken homes, no fathers around.  Their

22　family life is -- pervades with poverty, drug addiction,

23　alcoholism, mental health issues, sexual abuse, physical abuse.

24　They live in horrible neighborhoods, have no role models, drop

25　out of school.

1        These are people that come in -- many of these people

2   come in; they never had a chance.  They come before me having

3   been found guilty of a variety of drug and gun offenses that

4   are largely a product of their environment.  They're capable of

5   free choice.  They're guilty of crimes.  And I have to give

6   them statutory mandatory minimums because of legislation

7   requiring it.  And that's the law, and I accept the law.

8        But it breaks my heart because many of these

9   defendants didn't have a chance.  They grew up in environments

10  where the only surprising thing is they weren't in front of me

11  sooner.

12       You had a good education.  You didn't suffer poverty.

13  This is another aggravating factor because you had a good life

14  that didn't -- and you didn't have to make the choices you

15  made.  The criminal conduct here was not inevitable.

16       Had this conduct been uncovered near the time when it

17  occurred, a grand jury sitting in Kendall County would have

18  indicted you, a jury likely would have convicted you, and you

19  likely would have been sentenced to decades in a state prison.

20  Of course, your teaching and coaching career would have been

21  over, and all of your public service would never have occurred.

22  All the money you earned as a lobbyist would never have been

23  earned.

24       But because the statute of limitations for your child

25  molestation ran out many years ago, you can't be charged for

1    that.  And I can't sentence you as a child molester.  It's not

2    what you were charged with, it's not what you've pled guilty

3    to, and any sentence I give you today will pale in comparison

4    to what you would have faced in state court.

5         But this conduct is relevant to your history and

6    characteristics no matter how old it is.  Some conduct is

7    unforgivable no matter how old it is.  If the juvenile victim

8    of sex abuse can't forget decades later what happened, then

9    neither can I as a judge nor can we as a society.  The abuse

10   was 40 years ago, but the damage lasts today.  Mr. Cross made

11   that clear.

12        The statements of the victims that the victims have

13   given to the government and the statements of Ms. Burdge and

14   Mr. Cross make clear it's not just the victims who were harmed;

15   it's entire families who learn of the abuse and wonder how they

16   weren't able to prevent it, how they failed to protect their

17   child or their sibling.

18        What could be worse for a parent, knowing they

19   entrusted their child to a coach, allowed them to go on

20   overnight trips to wrestling camps, little knowing their child

21   would be abused by the man they trusted.  The shame and the

22   angst family members feel because they failed to protect their

23   child is palpable and adds to the damage here.

24        My sentence today can't legally or properly be a

25   sentence for child molestation, and I don't want it in any way

1    to be perceived that the sentence here measures the harm caused

2    by the child molestation.  In the end, that would have to be a

3    state court judge sentencing you for a conviction of child

4    molestation, and the sentence in this case can never be as long

5    as the time the victims and their families have suffered.

6         To Mr. Cross, he showed incredible courage coming in

7    here today to testify.  He didn't have to.  The defendant is

8    not contesting what he said occurred.  I believed everything

9    Mr. Cross said.  It puts a face and a voice on the damage a

10   teacher and a coach can cause by sexually abusing a student.

11        It doesn't go away.  It just doesn't.  It's hard to

12   look at Mr. Cross, now in his late 50s, and know that this

13   happened when he was 17 and he is still damaged.

14        And, Ms. Burdge, people will now believe you.  I

15   believe you.  And through you, I believe your brother.  He was

16   tragically sexually abused by the defendant just like

17   Victims A, B, C, and Mr. Cross.  I hope this proceeding today

18   brought you some amount of solace, despite these incredibly sad

19   facts.

20        The rise of Dennis Hastert took decades, and it was a

21   result of dedication, hard work, and ostensibly standing by his

22   principles.  The fall occurred in days and was as sharp and

23   precipitous as could ever be imagined.

24        Losing your good name is a significant punishment.

25   The defendant's good name is gone; it's obliterated.  Cynics

1    will say, "So what?  That's not real punishment."  I disagree.

2    It's a level of punishment.  Any person in this room who values

3    their good name would recognize that losing it is a form of

4    punishment.  And it's undoubtedly deserved, but that doesn't

5    make it any less a form of punishment.

6              And if there is a public shaming of the defendant

7    because of the conduct he's engaged in, so be it.  When you

8    hold yourself out as someone other than who you are, that

9    exposure inevitably will be devastating.  Having your portrait

10   taken down from the Capitol is a significant public shaming,

11   but it's simply not comparable to the damage suffered by a

12   minor who has been sexually abused.

13             How difficult it must have been for years to hide

14   these secrets.  The defendant must have known that someday

15   these victims would come forward.  But that difficulty pales in

16   comparison to the difficulty of the abuse victims themselves

17   living with these secrets, knowing that people would not

18   believe them, that people would hold them up to public scorn,

19   that anyone who came forward would no longer just have the pain

20   of being sexually abused; they'd have the pain of knowing no

21   one believed them.  Now people believe them.

22             I have to take into account a number of factors for

23   sentencing.  One is your age.  Your age is a consideration, but

24   it's not a critically compelling one to me.  You're 74 years

25   old.  While your sexual molestations occurred decades ago, the

1   structuring offenses occurred when you were in your early 70s,

2   and your lies to the FBI and your obstructive conduct by trying

3   to set up Victim A also occurred when you were in your early

4   70s.

5          You committed crimes when you were elderly, so your

6   age should not be an excuse to prevent giving you a custodial

7   sentence.  In fact, many elderly people are in jail in the

8   federal prisons.  As of January 2016, there were 4,601 federal

9   prisoners over the age of 65.

10         While we all have a certain number of days left in our

11  life, older people are obviously nearer to the end of their

12  lives, so sentencing an elderly person to jail can be

13  especially hard for that person because if you have limited

14  foreseeable days on earth, you don't want to spend them in

15  jail.

16         But as I said, if you're old when you commit crimes,

17  the punishment imposed for that conduct necessarily occurs when

18  you are old.  Your age didn't prevent you from committing

19  crimes; your age should not prevent you from being punished for

20  those crimes.

21         I will also note, as I did earlier, that while the

22  defendant is obviously elderly and ill, he is not an infirm,

23  helpless, handicapped senior citizen who is not aware of what's

24  going on.  He called Mr. Cross's brother, asking for a letter

25  of support for him to send to the Court.

1      The more important factor I must consider is the

2  defendant's health.  He is unquestionably a sick, frail man

3  because of the health setbacks he suffered after his guilty

4  plea.  His lawyers reported his condition to me when I

5  continued the sentencing that was originally scheduled to occur

6  earlier this year.  His lawyers submitted a very detailed

7  letter from his doctor, Dr. Egly.  Dr. Egly described serious

8  health issues, saying the defendant needed 24-hour care and

9  follow-up appointments with the specialists who treat him.

10      I wanted an independent expert to advise me on the

11  defendant's condition.  Dr. Robert Golden of Northwestern

12  Hospital was a doctor who was jointly suggested by the

13  government and the defense and who I independently vetted

14  through a variety of sources.

15      I want at this time to thank Dr. Golden for his

16  significant contributions to this case and the large amount of

17  time he dedicated to it.  Dr. Golden is an extremely competent,

18  experienced, and careful doctor.  He is a physician licensed to

19  practice in the state of Illinois and board-certified by the

20  American Board of Internal Medicine.  He is an assistant

21  professor of clinical medicine at Northwestern's Feinberg

22  School of Medicine, and he has been practicing primary care

23  internal medicine for 22 years.

24      I told Dr. Golden to review any records and speak to

25  any people he needed to in his professional judgment in order

1    to assess the defendant's health.  There were no limits placed

2    on Dr. Golden.  He examined all of the defendant's medical

3    records, spoke to Dr. Egly and all the specialists, and

4    examined the defendant himself.

5         I also wanted Dr. Golden to determine the defendant's

6    ability to safely serve a custodial sentence should I decide to

7    impose one.

8         Dr. Golden essentially confirmed Dr. Egly's finding

9    that the defendant needs continuous care for his many health

10   issues.  Quite logically, he found that the defendant's ability

11   to safely serve a custodial sentence depends on the defendant's

12   current level of disability, his medical needs, and the

13   services that are available at a federal correctional facility.

14        I had Dr. Paul Harvey, the regional medical director

15   for the Bureau of Prisons, review the defendant's medical

16   records, review a draft of Dr. Golden's report, and then issue

17   a report himself.  Dr. Golden spoke to Dr. Harvey, and then

18   Dr. Golden issued his own final report.

19        Dr. Harvey wrote that based on the defendant's current

20   health, if he is sentenced to a period of incarceration, he'd

21   likely be designated to serve any such sentence in a Bureau of

22   Prisons Level 4 medical facility.  According to Dr. Harvey,

23   Level 4 inmates are those who require services available at a

24   medical reference center and may require daily nursing.

25        Examples of such conditions are those with cancer in

1    active treatment, dialysis, quadriplegia, stroke or head injury

2    patients, major surgical patients, or acute psychiatric illness

3    requiring inpatient treatment.

4            Dr. Harvey wrote in his letter that the Bureau of

5    Prisons has six medical referral centers, five of which admit

6    men, located in Devens, Massachusetts; Butner, North Carolina;

7    Lexington, Kentucky; Springfield, Missouri; and Rochester,

8    Minnesota.

9            Any one of these medical referral centers -- at any

10   one of these medical referral centers, Mr. Hastert will be able

11   to continue his physical therapy regimen with in-house physical

12   therapists and receive assistance with his activities of daily

13   living from nursing staff or trained inmate companions.

14           Significantly, the MRC facilities have clinical staff

15   available in house 24 hours per day and have contracts with

16   community specialists for additional review and/or care if

17   clinically necessary.

18           Regarding concerns related to the management of

19   Mr. Hastert's diabetes, it's important to note that the BOP

20   cares for thousands of diabetic patients.  While most

21   institutions have set times where diabetic inmates may check

22   their blood sugar and receive injections, some institutions

23   have experimented with providing diabetic inmates with their

24   own personal glucometers and insulin pumps.

25           He goes on to talk about the various ways in which

1    diabetic patients are treated in these facilities.

2          Regarding Mr. Hastert's medication, the BOP has a

3    national drug formulary similar to formulary lists used by

4    private medical insurance companies.  The formulary is a list

5    of medications the bureau's medical staff consider to be

6    high-quality, cost-effective medications for the inmate

7    population.  Medications are constantly reassessed and

8    extensively reviewed for inclusion, exclusion, or restriction

9    in the formulary based on evidence-based medical practice and

10   security concerns.

11         He goes on to talk about how the necessary medications

12   are provided to inmates and also how they provide medical

13   equipment to inmates, if necessary, whether it be a wheelchair,

14   CPAP machines, or a walker.

15         Once Dr. Golden reviewed Dr. Harvey's report and

16   interviewed Dr. Harvey, he reached the following conclusion:

17   "In recent months, Mr. Hastert suffered from a catastrophic and

18   life-threatening illness resulting in significant disability.

19   He also has medical conditions that put him at risk for

20   complications.  I had concerns regarding the level of care and

21   attention that would be available to manage his risks and

22   disabilities via the Federal Bureau of Prisons, but a careful

23   review of his needs and the array of services that would be

24   available to him in the Bureau of Prisons medical referral

25   centers has reassured me that his needs can be met."

1    The defense delivered a submission on Monday

2  expressing concerns that Dr. Harvey's evaluation and

3  derivatively Dr. Golden's conclusion is at best naive and

4  overly trusting of the ability of the Bureau of Prisons to care

5  for someone in the defendant's condition.  I carefully reviewed

6  that submission.  I spoke to Dr. Harvey about it late last

7  night.  A BOP hospital is not Northwestern Memorial Hospital.

8  It's not even Copley Hospital where the defendant was treated.

9  It's still a jail, and the amenities of a private hospital are

10  not there.

11    But I am satisfied based on Dr. Harvey's report,

12  Dr. Golden's report, my discussion with Dr. Harvey, and,

13  finally, a discussion I had with the warden of the BOP facility

14  in Rochester yesterday that the defendant's vital health needs

15  will be met if he is incarcerated.

16    Mr. Wise expressed concerns that inmate populations

17  who help provide services to wheelchairbound patients are

18  poorly trained and may abuse Mr. Hastert because of the child

19  molestation facts that have arisen here.  The warden assured me

20  that they carefully screen and train these companion inmates

21  and that if a prisoner needs specialized help, full-time aides

22  perform that task.  They have a large contingent of medical

23  staff available 24/7, along with full-time correctional

24  officers and nurses who are always present.

25    Surprisingly, a significant percentage of the

1    prisoners at Rochester are sex offenders, so if this defendant

2    is designated there, he will not be singled out because of his

3    molestation background.  He'll be joining others who have

4    similar backgrounds.

5         If the defendant needs an examination by a specialist,

6    the prison has a contract with Mayo Clinic, and the examination

7    will occur there.  People travel all over the world to go to

8    Mayo Clinic.  That's where Rochester Bureau of Prisons inmates

9    go if they need a specialist.  If the defendant ends up at

10   another Level 4 medical jail, it will also be associated with a

11   fine hospital, usually a teaching hospital.

12        There are no guarantees the defendant won't get sicker

13   in jail, just as there are no guarantees he won't get sicker at

14   home.  But the Bureau of Prisons holds prisoners older and

15   sicker than the defendant and provides them adequate health

16   care.  They will do the same here if I sentence the defendant

17   to jail.

18        Finally, if the defendant's health suffers

19   precipitously in jail, the warden told me they act aggressively

20   to process a compassionate care release for the prisoner so the

21   case returns to me for resentencing and release.

22        But for the age and, more importantly, the genuine

23   health issues of the defendant, the sentence I am about to

24   impose would be significantly greater.  The defense wants me to

25   impose a sentence of probation.  Any sentence of straight

1    probation would be inappropriate.

2          There is a symbolism society attaches to jail.  It

3    means that the conduct is not permissible or accepted in

4    society.

5          I'll agree with you, Mr. Green, this is a tragic and

6    sad case.  It gives me no pleasure to sentence someone like

7    Mr. Hastert to a period of incarceration.  It's sad for our

8    country.  He's the former Speaker of the House.  It's sad for

9    the victims because it's his conduct that he did with them that

10   brought him here.  This is tragic and sad from every level.

11         The government is recommending a guidelines sentence,

12   meaning between zero and six months in jail.  I understand why

13   they agreed to make that recommendation.  As a prosecutor, I

14   understand -- former prosecutor, I understand that you make

15   plea agreements such as that to help facilitate a plea and

16   respect the wishes of victim witnesses who would prefer not to

17   have to testify in court.

18         So I don't criticize the government for their

19   recommendation, but I believe it also is inappropriate.  It's

20   not sufficient to comply with the purposes of sentencing.  It

21   doesn't reflect the seriousness of the crime and the conduct

22   surrounding it.  It will not promote respect for the law or

23   provide just punishment for the offense to give simply a

24   guidelines sentence.

25         I'm going to sentence the defendant to a period of

1   15 months' incarceration.  I believe that sentence is

2   sufficient, but not greater than necessary, to comply with the

3   purposes of sentencing.

4           So it will be the sentence of the Court -- pursuant to

5   the Sentencing Reform Act of 1984, it's the judgment of the

6   Court that the defendant, John Dennis Hastert, is hereby

7   committed to the custody of the Bureau of Prisons, to be

8   imprisoned for a total term of 15 months on Count II.

9           It's ordered the defendant shall pay a fine to the

10  United States in the amount of $250,000, which is due within

11  30 days of sentencing.  The monies go into a crime victims

12  fund, which is entirely appropriate in this case.

13          The defendant is ordered to pay a special assessment

14  fee of $100, which is due immediately.

15          To the extent costs of incarceration are imposed or

16  can be imposed by the Bureau of Prisons, they're not waived.

17          As I said earlier, the term of supervised release will

18  be two years, and I'm not going to repeat the period -- or the

19  different conditions of supervised release.

20          I should tell the defendant you can appeal your

21  conviction, which was a guilty plea, if you believe your guilty

22  plea was somehow unlawful or involuntary or if there's some

23  other fundamental defect in the proceedings that were not

24  waived by your guilty plea.

25          You also have a statutory right to appeal your

1    sentence under certain circumstances, particularly if you think

2    the sentence is contrary to law.

3              Any notice of appeal must be filed within 14 days of

4    the entry of judgment, or within 14 days of the filing of a

5    notice of appeal by the government.

6              If requested, the clerk will prepare and file a notice

7    of appeal on your behalf.  And if you can't afford to pay the

8    costs of an appeal or for appellate counsel, you have the right

9    to apply for leave to appeal *in forma pauperis*, which means you

10   can apply to have the Court waive the filing fee.

11             On appeal, you may also apply for court-appointed

12   counsel.

13             Is there a dismissal of the other count of the

14   indictment by the government?

15             MR. BLOCK:  Yes, your Honor.  The government moves to

16   dismiss Count I of the indictment.

17             THE COURT:  That motion is granted.

18             We need to set a surrender date.  Mr. Green, do you

19   have a suggestion as to that?

20             MR. GREEN:  Well, your Honor, I mean, I think any

21   surrender date should be linked to the availability of

22   placement at a Level 4 institution.

23             THE COURT:  I agree completely.  We can -- I believe

24   the designation process, Ms. Kieckhafer, can begin immediately.

25   Is that correct?

1          MS. KIECKHAFER:  That's correct, Judge.

2          THE COURT:  All right.  Once the designation process

3    is completed and he has been designated to a particular

4    facility, I'd like you and the government to come back in --

5    the defendant's presence will be waived -- and we'll set a firm

6    surrender date at that time.

7          MR. GREEN:  Very well.

8          THE COURT:  I don't want him surrendering any place

9    other than a Level 4 facility.  If the designation is not at a

10   Level 4 facility, I want you back because I'm going to ask you

11   to come back, along with a representative of the Bureau of

12   Prisons, to find out why not.

13         MR. GREEN:  All right.

14         THE COURT:  This is not meant to be a death sentence.

15   He has serious health issues.  They can be addressed at a

16   Level 4 facility, and I want them addressed there.

17         So once the designation has occurred, you, Mr. Gallo,

18   and the government can come back, and we will set a firm

19   surrender date.

20         The Bureau of Prisons recommends the surrender date be

21   early in the week, and they also recommend it be early in the

22   day.  I'll allow him to self-surrender.

23         Are there any other matters that need to be covered?

24   First I'll ask the government.

25         MR. BLOCK:  Can I have one moment, your Honor?

1           THE COURT:  You may.

2      (Counsel conferring.)

3           MR. BLOCK:  Your Honor, we'd ask the same bond

4 conditions to stand while the defendant is out of custody.

5           THE COURT:  They will.

6           Any other matters to cover from probation?

7           MS. KIECKHAFER:  No, your Honor.

8           THE COURT:  And from the defense?

9           MR. GREEN:  No, sir.

10           THE COURT:  Nothing today gave me any pleasure at all.

11 This is a horrible case, a horrible set of circumstances,

12 horrible for the defendant, horrible for the victims, horrible

13 for our country.  I hope I never have to see a case like this

14 again.

15           We're adjourned.

16           THE CLERK:  All rise.

17      (Concluded at 11:54 a.m.)

18           C E R T I F I C A T E

19    I certify that the foregoing is a correct transcript of the

20 record of proceedings in the above-entitled matter.

21

22 */s/ LAURA R. RENKE*_____      *April 29, 2016*
    LAURA R. RENKE, CSR, RDR, CRR

23     Official Court Reporter

24

25